1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10   ALEX TAYLOR,                          CASE NO. C10-1317JLR

11                   Plaintiff,             ORDER DENYING RELIANCE'S
                                            MOTION FOR SUMMARY
12            v.                            JUDGMENT

13   RELIANCE STANDARD LIFE
     INSURANCE COMPANY, et al.,
14
                     Defendants.
15
            This matter comes before the court on Reliance Standard Life Insurance
16
     Company's ("Reliance") motion for summary judgment (Dkt. # 35).  Having considered
17
     the briefing of the parties, the administrative record, and the relevant law, and having
18
     heard oral argument, the court DENIES Reliance's motion for summary judgment (Dkt. #
19
     35).
20

21

22

ORDER- 1

1

## I.      BACKGROUND

2      This is an ERISA case in which Plaintiff Alex Taylor challenges Reliance's

3 termination of his long term disability ("LTD") benefits.  Mr. Taylor worked at

4 Defendant Corbis Corporation ("Corbis") from 1998 to 2005.  (Administrative Record

5 ("AR") 623-24.)  After being diagnosed with fibromyalgia in early 2005 (AR 1007), he

6 took a leave of absence under the Family and Medical Leave Act of 1993 (AR 683-86).

7 He returned to work part time, but ultimately he stopped work completely in July 2005.

8 (AR 623-24.)  In August 2005, Mr. Taylor submitted his LTD benefits claim to Reliance,

9 Corbis's LTD insurer.  (*See* AR 628.)  Reliance approved his claim and began paying

10 benefits in October 2005.  (AR 98.)  In November 2006, however, Reliance notified Mr.

11 Taylor that it was terminating his LTD benefits.  (AR 74-76.)  Mr. Taylor timely

12 appealed this decision (AR 168-87), and in September 2007 Reliance affirmed its denial

13 of benefits (AR 13-18).  In August 2010, Mr. Taylor initiated the instant action under the

14 Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to

15 recover Mr. Taylor's LTD benefits.  (Compl. (Dkt. # 1); *see also* Jan. 7, 2011 Order (Dkt.

16 # 24) (dismissing second, third, and fourth causes of action).)

17

## II.      ADMINISTRATIVE RECORD

18      "Judicial review of an ERISA plan administrator's decision on the merits is

19 limited to the administrative record."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d

20

21

22

ORDER- 2

1   623, 632 (9th Cir. 2009) (en banc).[1]  The court, therefore, summarizes the relevant

2   portions of the administrative record below.

3   **A. The Policy**

4        On November 1, 2001, Reliance issued a LTD insurance policy to Corbis ("the

5   Policy").  (AR 595-622.)  The Policy covered eligible employees, including Mr. Taylor.

6   (AR 623-24.)  The Policy provides that Reliance, in addition to being the insurer, "shall

7   serve as the claims review fiduciary with respect to the [Policy]."  (AR 606.)  As the

8   claims review fiduciary, Reliance "has the discretionary authority to interpret the . . .

9   [P]olicy and to determine eligibility for benefits."  (*Id.*)  The Policy further provides that

10  "[d]ecisions by the claims review fiduciary shall be complete, final and binding on all

11  parties."  (*Id.*)

12       The Policy states that Reliance "will pay a Month Benefit if an Insured: (1) is

13  Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under

14  the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits

15  satisfactory proof of Total Disability to [Reliance]."  (AR 610.)  An insured is "Totally

16  Disabled" if:

17       (1) during the Elimination Period and for the first 60 months for which a
             Monthly Benefit is payable, an Insured cannot perform the material
18           duties of his/her regular occupation;

19

20   _____

21       [1] Mr. Taylor submitted a supplemental declaration (Dkt. # 40) that attaches a Social
     Security disability benefits determination that was decided after Reliance had closed his case.
     Given that the document is not part of the administrative record, the court will not consider it in
22   ruling on this motion for summary judgment.

(a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; [and]

* * * * *

(2) After a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(AR 602.)

## B. Reliance's Initial Determination that Mr. Taylor was Totally Disabled

At the time Mr. Taylor stopped working at Corbis in July 2005, he was a systems engineer. (AR 627.) A systems engineer is required to perform at a sedentary physical exertion level, which involves sitting most of the time; standing or walking for brief periods of time; and lifting, carrying, pushing, or pulling ten pounds occasionally. (AR 689.) Furthermore, a systems engineer frequently types on a computer and uses written and verbal communication, as well as reasoning, math, and language. (AR 625.)

In his August 2005 application for LTD benefits, Mr. Taylor indicated that he was unable to work because of "debilitating pain, fatigue and cognitive dysfunction." (AR 627.) These symptoms first appeared in 2004 (AR 1106), and in January 2005, Dr. Richard Neiman diagnosed Mr. Taylor with fibromyalgia (AR 961, 1007).[2] Between

_____

[2] The administrative record does not contain Mr. Taylor's medical records from Dr. Neiman.

ORDER- 4

1    January and July 2005, Mr. Taylor was treated by, among others, Dr. Neiman; Dr. Kinne

2    McCabe[3]; and Dr. Philip Milam, Mr. Taylor's primary care physician.  During this time,

3    Mr. Taylor worked at Corbis only intermittently as he attempted to treat his fibromyalgia,

4    which affected him with varying degrees of severity.  (*See, e.g.*, AR 1007, 1013.)  Dr.

5    Milam monitored Mr. Taylor's progress,[4] and in July 2005 he opined that Mr. Taylor was

6    "unable to work in any occupation" at the present time (AR 1109) and recommended that

7    Mr. Taylor "be off work for treatment for the next year" (AR 1108).

8           After submitting his LTD benefits application to Reliance, Mr. Taylor saw Dr. Jay

9    Uomoto, a specialist in neuropsychology and rehabilitation psychology, for a disability

10   evaluation.  (AR 1076-1105.)  On September 6, 2005, Dr. Uomoto conducted a one-and-

11   a-half hour clinical interview with Mr. Taylor and performed six hours of cognitive

12   testing.  (AR 960.)  After reviewing the test results, Dr. Uomoto diagnosed Mr. Taylor

13   with "Cognitive Disorder, NOS," "Fibromyalgia Syndrome (by history)," and "Malaise

14   and Fatigue (by history)."  (*Id.*)  Although Mr. Taylor performed well on some of the

15   tests Dr. Uomoto administered (*see generally* AR 960-76), Dr. Uomoto found that he

16

17   _____

18        [3] Mr. Taylor sought treatment from Dr. McCabe because she is a physician who uses
     naturopathic remedies.  (*See* AR 1007.)  Dr. McCabe did not make any formal diagnosis but

19   attempted to treat Mr. Taylor's many physical symptoms.  (AR 994-1003.)  At one point, she
     noted that his fatigue and difficulty focusing were related to "self anger" and "perfectionist

20   tendencies."  (AR 998.)  She never addressed his fibromyalgia diagnosis or made a
     recommendation regarding whether or not he could work.

21        [4] Dr. Milam accepted Dr. Neiman's fibromyalgia diagnosis and also diagnosed Mr.
     Taylor with chronic fatigue.  (AR 1005.)  This diagnosis was later confirmed by Dr. Lauri Marti

22   in May 2006.  (AR 775.)

ORDER- 5

exhibited cognitive impairment in several areas (AR 977).  Dr. Uomoto summarized his

opinion as follows:

> [Mr. Taylor's] current neuropsychological deficits are likely to significantly impact his ability to carry out his responsibilities in his former position as a systems engineer.  These cognitive problems are likely compounded by problems with persistent pain and fatigue, the latter of which also reduced the patient's attention resources, further influencing his cognitive impairment.  The combination of pain, fatigue, and cognitive performance decrements likely do not allow the patient to maintain continuous and gainful employment in his former position, on a consistent part-time or full-time basis.

> Should his fibromyalgia condition change for the better, and there is reduced pain, fatigue, and cognitive impairment, at that point in time, Mr. Taylor could undergo a neuropsychological re-evaluation to document any change in cognition and assist with further vocational planning.

(AR 979.)  Mr. Taylor submitted Dr. Uomoto's report to Reliance on October 6, 2005.

(AR 991.)

On October 18, 2005, Reliance's medical department stated in an internal

document that Mr. Taylor was unable to work: "Restrictions and limitations less than

sedentary are supported [from] date of loss through 1/06."  (AR 990.)  This medical

opinion was based on the records Mr. Taylor submitted, which established that Mr.

Taylor had "fibromyalgia with related cognitive dysfunction."  (*Id.*)  This conclusion was

supported primarily by the records from Dr. Milam (AR 1005-27, 1106-09) and Dr.

Uomoto (AR 1076-1105).

On October 31, 2005, Reliance approved Mr. Taylor's LTD benefits effective

October 7, 2005.  (AR 98.)  The approval letter stated: "Based upon the information

received, we have determined that you meet the group policy's definition of Total

1   Disability for your occupation." (*Id.*)  The letter further notified Mr. Taylor that

2   "[p]eriodic documentation of your disability status will be required for further benefit

3   consideration.  The physician who is treating you must provide medical documentation of

4   your continuous disability that is satisfactory to us." (*Id.*)

5   **C. Reliance Requests Additional Evidence of Disability**

6           On January 23, 2006, Reliance requested Mr. Taylor's "medical records for the

7   period of *September 2005 through the present*." (AR 56 (emphasis in original).)  Mr.

8   Taylor sent updated records on March 9, 2006 (AR 800) and June 6, 2006 (AR 761) from

9   Dr. Steven Overman, Dr. Jon Berner, Dr. Milam, and Dr. Lauri Marti, among others.  Dr.

10  Overman, a rheumatologist, independently diagnosed Mr. Taylor in September 2005

11  with, among other things, "generalized pain syndrome consistent with fibromyalgia" and

12  "probable bipolar disorder, possibly a major factor in his fibromyalgia, sleep disorder and

13  over-exercising." (AR 804.)  Dr. Overman referred Mr. Taylor to Dr. Berner, a

14  psychiatrist.  (AR 823.)  Dr. Berner saw Mr. Taylor in October and December 2005.  (AR

15  823, 857.)  He did not diagnosis Mr. Taylor with bipolar disorder, but noted that Mr.

16  Taylor's testosterone levels were low.  (*Id.*)  Dr. Berner's records also show that he

17  supported Mr. Taylor's disability application.  (AR 857.)

18          Dr. Milam continued to see Mr. Taylor in connection with his fibromyalgia and

19  other complaints, including low testosterone.  During his April 6, 2006 visit, Mr. Taylor

20  reported to Dr. Milam that "[o]verall . . . he has been doing fairly well.  There hasn't been

21  a lot of change thus far in his symptoms." (AR 764.)  Dr. Milam noted that after Mr.

22  Taylor began a new dietary supplement, he "noticed an improvement in his fatigue . . . .

1  However, in spite of this improvement, he continues to have fatigue, little energy.  He

2  finds that he is quite worn out for a few days after doing anything that is somewhat

3  strenuous." (*Id.*)  On April 11, 2006, Mr. Taylor reported a pain level of six out of ten.

4  (*Id.*)  Then on two different visits in July 2006, he reported pain levels of five and four

5  out of ten.  (AR 737, 740.)

6       On May 26, 2006, Mr. Taylor saw Dr. Marti at the Fibromyalgia & Fatigue Center

7  in Bellevue, Washington.  (AR 776.)  Dr. Marti performed a "tenderpoint evaluation,"

8  which is used to diagnose fibromyalgia.  (AR 775.)  To diagnose fibromyalgia, the

9  patient must have a history of widespread pain, as well as pain in 11 of 18 tenderpoint

10  locations on the body.  (AR 211.)  Mr. Taylor exhibited pain in 14 of the 18 tenderpoint

11  locations on his body, and based on this test, Dr. Marti diagnosed him with fibromyalgia.

12  (AR 775.)  She also noted that he was being treated for low testosterone.  (*Id.*)

13  **D.  Reliance Seeks Independent Evidence of Disability**

14       In May 2006, Reliance sought to obtain its own evidence of Mr. Taylor's

15  disability and scheduled Mr. Taylor for a functional capacity evaluation ("FCE").  Mr.

16  Taylor appeared for the FCE with Susan Burnham, a certified legal nurse consultant, who

17  planned to audio tape the examination.  (AR 62.)  The examiner, however, refused to

18  proceed with Ms. Burnham present.  (*Id.*)  Reliance attempted to find another location

19  that would allow an observer to audio tape an FCE (AR 718) but was unsuccessful.

20  Because Mr. Taylor never participated in an FCE, Reliance sent Mr. Taylor a letter on

21  June 7, 2006 requesting medical records from February 2006 through the present.  (AR

22  67.)  The letter stated that "[t]he current medical treatment must substantiate less then

1    sedentary work capacity in order for the LTD (long-term) disability benefits to continue

2    beyond June 2006." (*Id.*)

3         While waiting for Mr. Taylor's updated medical records, Reliance scheduled Mr.

4    Taylor for an Independent Medical Examination ("IME") with Dr. Aleksandra Zietak,

5    which occurred on September 11, 2006.[5]  (*See* AR 702.)  Ms. Burnham accompanied Mr.

6    Taylor and audio taped the examination.[6]  (*Id.*)  Mr. Taylor indicated that the testosterone

7    injections were "not making him feel better."  (AR 703.)  He reported current symptoms

8    that included lack of energy (*i.e.* only three or four hours of energy a day), pain,

9    "cognitive issues," and migraines.  (AR 704.)  He stated that in general "he has pain

10   across most of his body, usually in the muscles he has used most recently or in the

11   muscles he [sic] has not used most recently.  For example, if he sits on the couch too

12   long, the pain increases."  (*Id.*)  During the examination, he reported that he had "pain in

13   the back of his legs, in the shoulder area, the muscle in the side of his arms."  (*Id.*)  He

14   also reported "joint pain in his hands, knees and right big toe."  (*Id.*)  Dr. Zietak's

15   physical examination resulted in the following report:

16        He does not appear to be in acute distress.  His attention, concentration, and
          affect appear to be within normal limits.  He appears to follow directions

17        well. . . .  Palpation reveals tenderness here and there in the left anterior
          chest area, upper back, middle back, and right buttock.  No trigger points or

18

19        [5] Dr. Zietak was selected to perform the examination by United Review Services, Inc., a

20   third party with whom Reliance contracted.  (*See* AR 702.)  She has a specialty in physical
     medicine and rehabilitation.  (AR 713.)

21        [6] Ms. Burnham prevented Mr. Taylor from providing personal data outside of his home

22   address on the intake paperwork and filling out a "Past History & Review of Systems form or a
     Pain Diagram."  (AR 702.)

ORDER- 9

1     muscle spasms are noted.  Axial load is negative.  Active cervical rotation
     is 60º to each side, side bending is 30º to each side, flexion is with the chin
2     reaching the chest, and extension is 70º.  Active shoulder flexion is 170º
     bilaterally.  Lumbar flexion is 60º, side bending is 40º to each side, and
3     extension is 30º.  Rotation is within normal limits.  At this point he tells me
     that his right anterior rib cage is starting to hurt after twisting.  Hip range of
4     motion is within normal limits.  The arms and legs are within normal limits.
     The arms and legs are warm and dry and skin color is good.  There is no
5     obvious swelling, deformity, or evidence of trophic changes.  Muscle tone
     is within normal limits.  Straight leg raise is 90º bilaterally in the reverse
6     position and 45º in the supine, with the claimant reporting left posterior leg
     pain with left side straight leg raise.  Strength is 5/5 in all four extremities.
7     Deep tendon reflexes are 2+ and symmetric throughout.  Hoffman and
     Babinski reflexes are negative.  While sitting on the examination table, he
8     tells me he has pain in the right upper arm where I had palpated earlier.  He
     can fully squat while having one hand on the table and one on the chair.  He
9     can walk on his heels, walk on his toes, and perform tandem gait.  Gait is
     within normal limits.  There is no increase in respiratory rate or pulse at the
10    end of the examination.

11 (AR 705-06.)

12      Dr. Zietak also reviewed Mr. Taylor's medical records that Reliance had

13 forwarded to her.  (AR 706-10.)  Her report briefly summarized Dr. Milam's records

14 from December 2004 through January 2006; Dr. McCabe's records from January through

15 March 2005; Dr. Uomoto's September 2005 report; Dr. Overman's records from

16 September and October 2005; and Dr. Berner's records from October and December

17 2005.  (*Id.*)

18      Based on her physical examination and review of Mr. Taylor's medical records,

19 Dr. Zietak diagnosed him with "[s]ubjective complaints of pain, fatigue, and mental

20 slowness" and "[d]isability conviction," among other things.  (AR 710.)  In response to

21 Reliance's directive that she describe her examination and findings in detail, she wrote,

22 "My examination and findings are described above . . . .  I find the claimant's

ORDER- 10

1   concentration, attention, ability to follow directions, and affect to be within normal limits.

2   He provides a good history.  I find no trigger points or clinical abnormalities of the

3   muscles or joints." (AR 710-11.)  In response to Reliance's request that she explain Mr.

4   Taylor's specific diagnoses and prognoses within Dr. Zietak's field of specialty, she

5   wrote:

6           Specific diagnoses are as listed above.   Review of the medical records
            provided reveals no objective findings consistent with any diagnosis to
7           explain the claimant's subjective complaints of pain, fatigue, and mental
            slowness.  On Jan. 4, 2005 Kinne McCabe notes that the claimant said he
8           had "every kind of test and specialist eval with no diagnosis." . . . The
            prognosis is uncertain because of the claimant's disability conviction.
9           Secondary gain cannot be ruled out.

10  (*Id.*)  In response to a question regarding whether treatment is appropriate, Dr. Zietak

11  responded, "I find no evidence that the claimant has fibromyalgia.  A psychiatrist could

12  determine whether treatment is appropriate for the claimant's disability conviction." (*Id.*)

13          On November 3, 2006, Dr. Zietak completed a "Physical Capacities

14  Questionnaire" in which she indicated that Mr. Taylor had no physical limitations and

15  could work at a "medium lift" exertion level, which meant that he could exert "20-50

16  pounds of force occasionally, and/or 10-25 pounds of force frequently, and/or a

17  negligible up to 10 pounds amount of force constantly." (AR 712.)  She also noted that

18  Mr. Taylor had a "strong disability conviction." (AR 713 (emphasis in original).)

19  **E.  Mr. Taylor Provides Updated Medical Records**

20          In response to Reliance's June 7, 2006 letter, Mr. Taylor submitted updated

21  records from Dr. Milam and Dr. Marti, among others, on September 25, 2006.  On

22

ORDER- 11

1   August 2, 2006, Mr. Taylor had seen Dr. Milam regarding the testosterone injections he

2   was receiving.  (AR 742.)  Dr. Milam wrote of Mr. Taylor:

3          He says he felt much improved on the higher level of testosterone.  He had
           more energy and actually worked in his yard up to 6 hours in a day, which
4          has been very rare.  He was a bit sore after that but believes the trade off is
           definitely worth it. . . .  Overall he is quite happy with the results.  He is
5          interested in continuing with the testosterone.

6   (*Id.*)  Mr. Taylor's reported pain level during that visit was three out of ten.  (AR 744.)  A

7   nurse's note from August 30, 2006 indicated that Mr. Taylor reported a pain level of six

8   out of ten on that day.  (AR 749.)

9   **F.  Reliance Terminates Mr. Taylor's LTD Benefits**

10         On November 21, 2006, Reliance sent Mr. Taylor a letter notifying him that it was

11   terminating his LTD benefits.  (AR 74-76.)  Reliance outlined the requirements for

12   receiving LTD benefits and stated that Mr. Taylor needed to establish that he could not

13   perform a sedentary level occupation.  (*See* AR 75.)  The letter explained, "In order to

14   evaluate whether [Mr. Taylor] is capable of performing the material duties of his own

15   [sedentary level] occupation, we have requested and reviewed the results of an

16   Independent Medical Evaluation (IME) . . . along with the information previously

17   contained in the file."  (*Id.*)  With respect to Dr. Zietak's report, the letter noted that

18   "[t]he physical examination did not reveal any objective findings consistent with any

19   diagnosis to explain [Mr. Taylor's] subjective complaints. . . .  It is also noted that there's

20   no evidence of Fibromyalgia and a psychiatrist could determine if a psychiatric diagnosis

21   supports impairment."  (*Id.*)  The letter concluded that "the medical information in [sic]

22   file does not support an impairment, which would interfere with [Mr. Taylor's] ability to

1    perform the material duties of a sedentary duty occupation as a Systems Engineer, as well

2    as performing any occupation for which his education, training or experience would

3    reasonably allow." (*Id.*)  The letter also explained Mr. Taylor's right to appeal and how

4    to do this.  (AR 76.)

5    **G. Mr. Taylor Appeals Reliance's Termination of his LTD Benefits**

6          On May 25, 2007, Mr. Taylor submitted to Reliance his appeal letter (AR 168-87),

7    along with letters from Dr. Overman (AR 544-53), Dr. Uomoto (AR 555-78), Ms.

8    Burnham (AR 213), and extensive medical literature about fibromyalgia (AR 214-542).

9    Dr. Overman's letter stated that he had six appointments with Mr. Taylor, the most recent

10   of which was on February 13, 2007.  (AR 544.)  During the February 13 appointment,

11   Mr. Taylor "continued to complain of severe problems with thinking, memory and sleep

12   as well as overall pain and reduced function." (*Id.*)  He further noted that Mr. Taylor

13   "had diffuse tenderness that was mild." (*Id.*)  Based on his knowledge of Mr. Taylor's

14   overall treatment for fibromyalgia, he opined that Mr. Taylor "is prevented from

15   performing the material duties of his own or any occupation due to the symptoms of pain,

16   fatigue, and cognitive problems well documented in his records."  (AR 546.)

17          Dr. Overman also criticized the IME report from Dr. Zietak.  (AR 545-46.)  Dr.

18   Overman noted that Dr. Zietak concluded that there were no "objective findings" to

19   support Mr. Taylor's complaints, but "her evaluation of concentration and attention did

20

21

22

1   not include any specific objective measures."[7]  (AR 545.)  Dr. Overman further attacked

2   her conclusion that there was no evidence supporting Mr. Taylor's fibromyalgia

3   diagnosis because she did "not delineate the specific 18 classification points" for a

4   fibromyalgia diagnosis.  (AR 545-46.)  He also noted that there was "no detailed

5   assessment on her part that would substantiate a 'disability conviction,'" and that her

6   conclusion that Mr. Taylor needed psychiatric consultation did not take into account that

7   Mr. Taylor had already received such treatment from Dr. Berner.  (AR 546.)  In her

8   report, Dr. Zietak had incorrectly described Dr. Berner as a psychologist, rather than a

9   psychiatrist.  (AR 545.)

10         Dr. Uomoto's letter similarly criticized Dr. Zietak's report and her methodologies

11   and qualifications for assessing Mr. Taylor's cognitive abilities.  (AR 555-56.)  Dr.

12   Uomoto had not assessed Mr. Taylor since 2005, but he opined that "it is very unlikely

13   that cognitive symptoms would have improved enough to enable Mr. Taylor to be able to

14   work competitively in any occupation, unless his underlying medical conditions were

15   significantly improved."  (*Id.*)

16         Finally, Ms. Burnham's letter explained inconsistencies between the examination

17   she observed and Dr. Zietak's report.  (AR 213.)  Ms. Burnham stated that Dr. Zietak did

18   not in fact perform a complete tenderpoint evaluation, and she did not take Mr. Taylor's

19

20         [7] Dr. Overman also pointed out that Dr. Zietak stated that Mr. Taylor was a smoker when
21   he does not in fact smoke.  (AR 545.)  Dr. Zietak's incorrect statement, however, appears to be
     the result of a typo.  Dr. Zietak wrote, "He does smoke cigarettes.  He did try cigarettes in the
22   past."  (AR 705.)  If Dr. Zietak actually understood Mr. Taylor to smoke cigarettes, it is unlikely
     that she would have written that he tried them in the past.

ORDER- 14

1    pulse at the end of the examination even though her report stated that he had "no increase

2    in respiratory rate or pulse at the end of the examination." (*Id.*)

3    **H. Reliance Affirms its Termination of Mr. Taylor's LTD Benefits**

4        On September 12, 2007, Reliance denied Mr. Taylor's appeal. (AR 13-18.) In its

5    denial letter, Reliance addressed Mr. Taylor's contention that Dr. Zietak "is unqualified

6    to render expert opinions about fibromyalgia . . . [as] [h]er specialty does not include any

7    aspect of rheumatology, psychology or psychiatry, and she is not qualified to render

8    opinions about anyone's precise cognitive state." (AR 15.) Reliance affirmed its

9    position that Dr. Zietak was qualified but noted that it sent Mr. Taylor's entire file,

10   including the documents submitted in support of his appeal, for review by an IME

11   rheumatologist, Dr. Anne MacGuire. (AR 14, 693-96.) Dr. MacGuire reviewed the file

12   and concluded that "[n]o restrictions and limitations are supported by any medical

13   evidence throughout this medical evaluation. . . . None of [Mr. Taylor's physicians] have

14   documented limited range of motion, synovitis, weakness or any evidence of clinical

15   functional abnormality. No laboratory findings have objectified his numerous subjective

16   complaints." (AR 15-16, 695.) Reliance observed further that "in Dr. MacGuire's

17   opinion, there appears to be no neurological basis for the 'cognitive problems' that you

18   cite." (AR 16.) Reliance concluded that "Dr. MacGuire's report conclusively verifies a

19   lack of work impairment that would preclude Mr. Taylor from performing his own

20   occupation." (AR 17.) Accordingly, Mr. Taylor was not Totally Disabled, as defined by

21   the Policy. (*Id.*) Reliance advised Mr. Taylor that its claim decision was final and that he

22   had a right to bring a civil claim under ERISA. (AR 17-18.)

1    Nevertheless, on October 10, 2007, Mr. Taylor requested an additional appeal,

2    citing alleged concerns regarding the completeness of the materials Dr. MacGuire

3    reviewed.  (AR 5-7.)  On October 11, 2007, Reliance confirmed that Dr. MacGuire had

4    received all records in the claim file and denied Mr. Taylor's request for a second appeal,

5    citing its policy of providing only one appeal.  (AR 3.)

6                                    **III.    ANALYSIS**

7    **A. Standard of Review**

8    Ordinarily, summary judgment is appropriate if there is no genuine issue as to any

9    material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

10   P. 56(a).  In ERISA actions, however, where the plaintiff is challenging the plan

11   administrator's denial of benefits and the abuse of discretion standard applies, *see infra* §

12   III(A)(2), "a motion for summary judgment is merely the conduit to bring the legal

13   question before the district court and the usual tests of summary judgment, such as

14   whether a genuine dispute of material fact exists, do not apply," *Bendixen v. Standard*

15   *Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) (overruled in part on other grounds by *Abatie*

16   *v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966-69 (9th Cir. 2006) (en banc)); *see also*

17   *Nolan v. Heald Coll.,* 551 F.3d 1148, 1154 (9th Cir. 2009).  Thus, a summary judgment

18   motion resting on the administrative record is not a typical summary judgment, but

19   rather, is a procedural vehicle for determining whether benefits were properly granted or

20   denied.

21

22

ORDER- 16

**1.  Whether De Novo Review Applies**

In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011), the Ninth Circuit synthesized and clarified the appropriate standard of review for the denial of ERISA benefits.  Courts apply de novo review unless the plan "expressly and unambiguously gives the administrator discretion to determine eligibility."  *Id.* at 673. Where the plan gives the administrator discretion, courts review for an abuse of the plan administrator's discretion.  *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  Here, the Policy stated: "[Reliance] has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits."  (AR 606.)  This grant of discretion is unambiguous, therefore the court reviews for an abuse of discretion.

Although Mr. Taylor concedes that the policy language unambiguously grants Reliance discretion, he nevertheless asserts that de novo review is appropriate.  (Resp. at 12-13.)  Mr. Taylor argues that there is no evidence that Corbis granted Reliance discretionary authority because the record does not contain a copy of the ERISA plan for Corbis, only a copy of the Policy.  (Resp. at 13.)  Mr. Taylor, however, cites no authority for his assertion that the record must contain a copy of the ERISA plan.  The Policy, as a contract between Corbis and Reliance, is sufficient to grant Reliance discretionary authority.  Mr. Taylor further contends that the Policy "is not the policy that would govern a disability commencing in 2005, since on its face it states its effective date is November 1, 2001 . . . ."  (*Id.*)  The fact that the Policy went into effect in 2001 does not preclude it from remaining in effect in 2005.  Mr. Taylor cites no evidence that some

ORDER- 17

1  superseding policy governs Mr. Taylor's claim.  Because the Policy expressly and

2  unambiguously grants Reliance discretion to determine benefits eligibility, the court

3  reviews for abuse of discretion.

4  **2.  Abuse of Discretion Standard**

5       The central question in an ERISA case where the abuse of discretion standard

6  applies is whether the plan administrator's decision to deny benefits was reasonable.

7  *Salomaa*, 642 F.3d at 675.  Reasonableness does not mean that the court would make the

8  same decision.  *Id.*  At the same time, "deference to the plan administrator's judgment

9  does not mean that the plan prevails."  *Id.*  "[T]he test for abuse of discretion in a factual

10 determination (as opposed to legal error) is whether 'we are left with a definite and firm

11 conviction that a mistake has been committed.'"  *Salomaa*, 642 F.3d at 676 (quoting

12 *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (citation and

13 quotation omitted)).  To apply the abuse of discretion test, the court must consider

14 "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3)

15 without support in inferences that may be drawn from the facts in the record.'"  *Id.* at 676

16 (quoting *Hinkson*, 585 F.3d at 1262).

17      Where the insurer is both the funding source and plan administrator, as is the case

18 here, the administrator operates under a structural conflict of interest, *Abatie*, 458 F.3d at

19 965, which requires "a more complex application of the abuse of discretion standard,"

20 *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 626 (9th Cir. 2009).  The court

21 must weigh the conflict of interest as a factor in determining whether the administrator

22 abused its discretion, however the weight given to the factor varies depending on the

specific facts of each case. *Salomaa*, 642 F.3d at 674 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)); *see also Abatie*, 458 F.3d at 968.

Reliance argues that it actively alleviated the structural conflict of interest by relying on two IME reports to assess Mr. Taylor's disability. (Mot. at 10-11 (citing *Montour*, 588 F.3d at 630).) *Montour*, however, does not support Reliance's argument. Whether an administrator employs an IME is one among many factors that courts consider in determining whether an administrator abused its discretion, but it does not change the weight that the court assigns to the conflict of interest. *Montour*, 588 F.3d at 630. Given the absence of any evidence that would accord Reliance's structural conflict of interest greater or lesser weight, the court concludes that the conflict warrants moderate weight.

**B. Reasonableness of Reliance's Termination of Mr. Taylor's Benefits**

Reliance argues that its termination of Mr. Taylor's benefits was reasonable because Mr. Taylor's physicians identified the cause of his physical problems—low testosterone—and the treatment was so successful that Mr. Taylor worked in his yard for up to six hours one day. (Mot. at 11.) Reliance points out that it based its decision on two IME reports, which found that there was no evidence that Mr. Taylor had a physical impairment. (Mot. at 12.) Furthermore, Reliance argues that it was under no obligation to defer to Mr. Taylor's treating physicians, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), who, in any event, failed to provide objective evidence that Mr. Taylor's diagnosis was disabling, *see Jordan v. Northrop Grumman Corp. Welfare*

1  *Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004) (overruled in part on other grounds by

2  *Abatie*, 458 F.3d at 969).  (Mot. at 12-13.)

3        Mr. Taylor disputes the reasonableness of Reliance's determination for four

4  primary reasons: (1) Reliance did not provide a full and fair review of his file and

5  therefore violated ERISA; (2) Reliance improperly required objective proof of disability

6  while ignoring objective evidence of Mr. Taylor's disabling cognitive dysfunction and

7  dismissing his subjective complaints of pain and fatigue; (3) Reliance unreasonably

8  ignored Mr. Taylor's complaints of chronic pain and fatigue from fibromyalgia; and (4)

9  Reliance's decision to terminate his benefits was illogical because Reliance had no

10  reliable evidence that his medical condition had changed.  (*See generally* Resp.)  The

11  court addresses each contention in turn and then weighs the relevant factors, including the

12  structural conflict of interest.  The court concludes that Reliance abused its discretion.

13        **1.  Full and Fair Review of Mr. Taylor's File**

14        When assessing a claimant's appeal of a termination of benefits, an administrator

15  must provide a "full and fair review" of the file.  29 C.F.R. § 2560.503-1(h)(2).  Mr.

16  Taylor asserts a two-pronged argument as to why Reliance's review of his file violated

17  ERISA: (a) Reliance did not take into account all of the comments in his claim file; and

18  (b) Reliance did not engage in the necessary "meaningful dialogue."  (Resp. at 17-20.)

19  The court concludes that Reliance did not provide a full and fair review of Mr. Taylor's

20  file as required by ERISA.

21

22

1        **a.  Consideration of All Comments in Claim File**

2        A plan administrator must provide for a review that takes into account all

3   comments, documents, records, and other information submitted by the claimant relating

4   to the claim, without regard to whether such information was submitted or considered in

5   the initial benefit determination.  29 C.F.R. § 2560.503-1(h)(2).  A plan administrator

6   "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions

7   of a treating physician," but is not required to automatically "accord special weight to the

8   opinions of a claimant's physician."  *Nord*, 538 U.S. at 834.  Furthermore, courts may not

9   "impose on plan administrators a discrete burden of explanation when they credit reliable

10  evidence that conflicts with a treating physician's evaluation."  *Id.*

11       Mr. Taylor asserts that Reliance did not explain why it did not give meaningful

12  weight to the information in the record that favors Mr. Taylor, that is, Dr. Uomoto's

13  reports, Dr. Overman's 2007 report, the medical literature Mr. Taylor submitted in

14  support of his appeal, and all of the other medical records in his file.  (Resp. at 17.)  Mr.

15  Taylor draws particular attention to Dr. Uomoto's 2005 report, which included objective

16  findings of a disability based on cognitive dysfunction.  (Resp. at 18.)  Mr. Taylor further

17  asserts that there was no change in his medical condition that would justify Reliance's

18  abandonment of this evidence.  (*Id.*)

19       Reliance responds that it did not ignore the evidence, rather it rejected it.  (Reply

20  at 8 (citing *Jordan*, 730 F.3d at 877).)  In *Jordan*, the court concluded that the

21  administrator did not "ignore" the claimant's physicians' reports, but rather "considered

22  and *rejected* them, after careful consideration."  *Jordan*, 370 F.3d at 877 (emphasis in

1   original).  *Jordan*, however, is distinguishable from this case.  The administrator in

2   *Jordan* repeatedly asked the claimant's treating physicians to explain *why* the claimant's

3   diagnosis of fibromyalgia caused her to be disabled, but her doctors failed to respond.  *Id.*

4   Three IMEs with different specialties reviewed the claimant's file, and each of them

5   disagreed with her treating physicians' finding of disability.  *Id.*  The administrator also

6   sent the peer review reports to the treating physicians and asked for an explanation of

7   why they disagreed.  *Id.* at 878.  Again, the treating physicians failed to respond.  *Id.*

8   Here, by contrast, the record does not establish that Reliance's consideration of Mr.

9   Taylor's file was as "careful" as that of the administrator in *Jordan*.  Reliance never

10  corresponded with Mr. Taylor's treating physicians to seek additional information as to

11  why his fibromyalgia was disabling, and it never sought out his treating physicians'

12  objections to Dr. Zietak's report.  *Jordan*, therefore, does not support Reliance's position.

13       Furthermore, Reliance had no grounds upon which to reject Dr. Uomoto's 2005

14  report.  Although *Nord* establishes that that a plan administrator does not need to provide

15  an explanation when it credits reliable evidence that conflicts with a treating physician's

16  evaluation, *Nord* does not excuse an administrator from explaining why it has refused to

17  credit reliable evidence that is not contradicted by other evidence in the record.  *See*

18  *Nord*, 538 U.S. at 834 (noting that plan administrators "may not arbitrarily refuse to

19  credit a claimant's reliable evidence").  In this case, there is no reliable evidence in the

20  record that contradicts Dr. Uomoto's 2005 diagnosis of a disabling cognitive disorder, but

21

22

1   in its two denial letters, Reliance failed to explain why it did not rely on Dr. Uomoto's

2   report.[8]

3        Reliance argues that it did not need to rebut Dr. Uomoto's opinion because (1) Dr.

4   Uomoto's report does not support Mr. Taylor's cognitive complaints; and (2) Mr. Taylor

5   was never reassessed by Dr. Uomoto after Mr. Taylor's condition improved due to the

6   testosterone shots.  Each argument is unpersuasive.  First, Reliance relied on Dr.

7   Uomoto's report when it made its initial determination that Mr. Taylor was disabled.

8   (AR 990 (noting in an internal Reliance document that Mr. Taylor had "fibromyalgia

9   with related cognitive dysfunction").)  To now attempt to discredit the report is

10  disingenuous and raises concerns that Reliance's structural conflict of interest has

11  impacted its assessment of Mr. Taylor's claim.

12       Second, although there is some evidence in the record that Mr. Taylor's symptoms

13  improved with the testosterone shots (AR 742-43), the balance of the record does not

14  suggest the overall improvement that Reliance claims.  On August 2, 2006, Mr. Taylor

15  reported some improvement and a pain level of three out of ten (*id.*), but on August 30,

16  2006, he reported a pain level of six out of ten (AR 749).  On September 11, 2006, Mr.

17  Taylor reported that the testosterone injections had not been helping.  (AR 703.)

18  Furthermore, Dr. Overman stated in his 2007 letter that Mr. Taylor continued to

19

20       [8] Dr. Zietak and Dr. MacGuire were both unqualified to offer an opinion regarding Mr.
    Taylor's neuropsychological functioning.  As Dr. Uomoto explained in his 2007 letter to
21  Reliance, extensive training is required to perform neuropsychological assessments, and Dr.
    Zietak, based on her credentials, was unqualified to render an opinion in this area.  (AR 556.)
22  Furthermore, Reliance admitted that Dr. MacGuire did not assess Mr. Taylor's
    neuropsychological condition.  (Reply at 6.)

1   experience "severe problems with thinking, memory and sleep as well as overall pain and

2   reduced function." (AR 544.) These facts contradict Reliance's claim that in November

3   2006, "the cause of [Mr. Taylor's] problems was identified and treated" (Mot. at 11).

4   Because it was unreasonable for Reliance to conclude, based on the entire claim file, that

5   Mr. Taylor's symptoms had improved, it was unreasonable for Reliance to abandon its

6   initial reliance on Dr. Uomoto's 2005 report without informing Mr. Taylor of this change.

7   The court, therefore, concludes that Reliance arbitrarily refused to credit Mr. Taylor's

8   objective evidence that he had disabling cognitive dysfunction, which prevented a full

9   and fair review of Mr. Taylor's claim file.

10                    **b.  Meaningful Dialogue**

11          Mr. Taylor also argues that Reliance did not engage in a "meaningful dialogue"

12   with him, as required by ERISA, because Reliance did not inform him of what

13   information he needed to submit to perfect his claim. (Resp. at 19-20.) As an ERISA

14   program administrator, Reliance must engage in a "meaningful dialogue" with a

15   claimant. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870

16   (9th Cir. 2008). This means that when an administrator terminates a claimant's long term

17   disability benefits, it must provide the claimant with a written notice of the denial of

18   benefits that includes a description of any additional material or information necessary

19   for the claimant to perfect the claim and an explanation of why such material or

20   information is necessary. 29 C.F.R. § 2560.503-1(g). Furthermore, the administrator

21   must describe the necessary additional material "in a manner calculated to be understood

22   by the claimant." *Saffon*, 522 F.3d at 870 (quoting 29 C.F.R. § 2560.503-1(g)).

1    Mr. Taylor contends that Reliance did not adequately describe the additional

2  material necessary for him to perfect his claim in its initial denial letter.  (Resp. at 20.)

3  Reliance argues that it fulfilled this requirement when it explained in the initial denial

4  letter that there was "an absence of medical evidence to confirm any significant

5  impairment that would keep [Mr. Taylor] from doing any of the material duties of his

6  job."  (Reply at 8 (quoting AR 75).)  In *Saffon*, the court considered the sufficiency of an

7  administrator's termination letter, which stated that "[t]he medical information provided

8  no longer provides evidence of disability that would prevent [the claimant] from

9  performing [her] job or occupation."  *Saffon*, 522 F.3d at 870.  The court concluded that

10  this statement was "uninformative" because it did not explain why this was the case or

11  address the claimant's evidence to the contrary.  *Id.*  Reliance's explanation here is

12  similarly vague.  It did not sufficiently describe what information Mr. Taylor needed to

13  submit to perfect his claim, and it did not explain why this information was necessary.[9]

14  Furthermore, Reliance did not address Dr. Uomoto's 2005 report, which provided

15  evidence that Mr. Taylor's cognitive disorder prevented him from performing his

16  occupation.  Reliance, therefore, failed to comply with ERISA's requirement that it

17  engage in a meaningful dialogue with Mr. Taylor.  *See id.*

18

19

20  ───────────────

21    [9] Although Mr. Taylor bears the burden of establishing a continuing disability under the
   plan (Mot. at 13), it is unreasonable for Reliance to criticize him for failing in his burden when
   Reliance did not comply with its ERISA obligation to explain what documents Mr. Taylor
22  should have submitted and why these were necessary.

ORDER- 25

### 2. Reliance's Requirement of Objective Evidence

Mr. Taylor next argues that Reliance acted contrary to Ninth Circuit precedent in requiring him to provide objective evidence of his impairment instead of crediting his subjective complaints of pain and fatigue and Dr. Uomoto's objective findings regarding his cognitive disorder.  (Resp. at 20-21.)  In *Salomaa*, the court adopted dicta from *Jordan* and held that "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious."  *Salomaa*, 642 F.3d at 678.  In *Jordan*, a case involving the termination of LTD benefits where the claimant had fibromyalgia, the court distinguished between objective evidence of a diagnosis and objective evidence that a condition was disabling.  *Jordan*, 370 F.3d at 877.  Although it was impermissible for the administrator to require objective evidence of a diagnosis, such a fibromyalgia, that cannot be established through laboratory tests or x-rays, the court found that the administrator was permitted to require objective findings that the claimant's condition prevented her from performing her occupation.  *Id.*  Therefore, Reliance did not abuse its discretion in requiring Mr. Taylor to submit evidence that his subjective complaints were severe enough to prevent him from performing his occupation.  Reliance, however, arbitrarily refused to credit Dr. Uomoto's 2005 report, which provided objective evidence that Mr. Taylor's cognitive dysfunction prevented him from performing his occupation. (*See supra* § III(B)(1)(a).)

### 3. Mr. Taylor's Complaints of Chronic Pain and Fatigue

Mr. Taylor next relies on *Pappas v. Reliance Standard Life Insurance Company*, 20 F. Supp. 2d 923 (E.D. Va. 1998), to argue that Reliance wrongly ignored Mr. Taylor's

1  complaints of chronic pain and fatigue from fibromyalgia.  (Resp. at 21-22.)  In *Pappas*,

2  the claimant was diagnosed with atypical Post Traumatic Migraine Disorder after

3  slipping and striking her head against a car door.  *Pappas*, 20 F. Supp. 2d at 925-26.  She

4  suffered severe headaches; a sensation of pressure in her head; nausea; intolerance to

5  motion, light, and noise; bleeding from the ear canal; and lightheadedness accompanied

6  by impaired concentration and vision.  *Id.* at 925.  Reliance denied her claim for LTD

7  benefits based on a lack of objective medical documentation to support her subjective

8  complaints.  *Id.* at 927.  The district court concluded that Reliance abused its discretion,

9  in part, because it "conceded and did not dispute the existence, severity, frequency or

10  duration of plaintiff's persistent symptoms . . . [but did not] squarely address whether

11  these undisputed severe and persistent symptoms were compatible or incompatible with

12  plaintiff's ability to perform the essential duties of her job as a CPA."  *Id.* at 930.

13     In contrast to *Pappas*, here, Reliance did not demand objective proof of Mr.

14  Taylor's subjective complaints.  Rather, it requested medical evidence establishing that

15  he could not perform a sedentary level job.  This is permissible in the Ninth Circuit.  *See*

16  *Jordan*, 370 F.3d at 877.  Moreover, Reliance did not "concede" the existence of Mr.

17  Taylor's symptoms; Dr. Zietak performed an in-person examination of Mr. Taylor and

18  concluded that he did not have fibromyalgia despite his subjective complaints of pain.[10]

19

20  [10] Although Mr. Taylor asserts that Dr. Zietak's report was deficient and biased (*see*

21  *generally* Resp.), the court concludes that Reliance did not abuse its discretion in relying on it.
First, Dr. Zietak is an independent medical examiner, and at least one court has found that she is

22  qualified to assess and diagnose fibromyalgia.  *See Carder-Cowin v. Unum Life Ins. Co. of Am.*,
560 F. Supp. 2d 1006, 1112-13 (W.D. Wash. 2008) (favorably assessing Dr. Zietak's

1   (*See* AR 710-11.)  In sum, the court concludes that Reliance acted within its discretionary

2   authority when it requested medical evidence that Mr. Taylor's symptoms prevented him

3   from performing his occupation.  As previously discussed, however, Reliance did not

4   properly inform Mr. Taylor of the reasons why his claim was deficient so that he could

5   submit additional evidence that addressed Reliance's concerns.  (*See supra* § III(B)(1).)

6   **4.  Evidence of a Change in Mr. Taylor's Medical Condition**

7       Finally, Mr. Taylor argues that Reliance improperly terminated his benefits

8   without evidence that his medical condition had changed.  (Resp. at 22.)  The Ninth

9   Circuit's opinion in *Muniz v. Amec Construction Management, Inc.*, 623 F.3d 1290 (9th

10  Cir. 2010), suggests otherwise.  In *Muniz*, the district court, under a de novo standard of

11  review, held that the claimant failed to meet his burden of establishing that he was

12  disabled under the terms of his LTD policy.  *Id.* at 1293-94.  On appeal, the claimant

13  argued that the district court clearly erred because his medical records did not show a

14  change in his condition.  *Id.* at 1296.  The Ninth Circuit rejected this argument:

15      [T]he fact that the claimant was initially found disabled under the terms of
        the plan may be considered evidence of the claimant's disability, but as the
16      Eighth Circuit stated in *McOsker v. Paul Revere Life Insurance Co.*, "[w]e
        are not suggesting that paying benefits operates forever as an estoppel so
17      that an insurer can never change its mind."

18

19  independence and qualifications to diagnose fibromyalgia).  Second, Dr. Zietak's report
    contained some evidence from which Reliance could infer that she performed a tenderpoint
    evaluation.  Her report stated, "Palpitation reveals tenderness here and there in the left anterior
20  chest area, upper back, middle back, and right buttock."  (AR 705.)  Although Dr. Overman and
    Ms. Burnham claimed that this was not a proper tenderpoint evaluation, it is enough for Reliance
21  to infer that Dr. Zietak reasonably concluded that Mr. Taylor did not have fibromyalgia.  *See*
    *Salomaa*, 642 F.3d at 676 (setting forth the test for an abuse of discretion, which includes
    consideration of whether the administrator's application of the correct legal standard was
22  supported by "inferences that may be drawn from the facts in the record").

*Muniz*, 623 F.3d at 1296-97 (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)).  *Muniz*, therefore, stands for the proposition that a plan administrator may, under the appropriate circumstances, terminate LTD benefits where the claimant's underlying condition has not changed.  Mr. Taylor, therefore, is not entitled to everlasting benefits unless and until his condition changes.  Rather, Reliance may require Mr. Taylor to provide ongoing evidence that his condition prevents him from working in his occupation.  *See id.* (affirming the district court's finding that the claimant was capable of performing a sedentary occupation even though there was no evidence that his underlying condition had changed).

### 5. Weighing the Relevant Factors

The court must weigh the relevant factors to determine whether Reliance abused its discretion.  *See Abatie*, 458 F.3d at 968.  Reliance's structural conflict of interest and failure to provide a full and fair review of Mr. Taylor's claim weigh against it, *see id.*; *Salomaa*, 642 F.3d at 679, but the fact that it employed two IMEs weighs in its favor, *see Montour*, 588 F.3d at 630.  After carefully considering the administrative record and these factors, the court is "left with a definite and firm conviction that a mistake has been committed." *Salomaa*, 642 F.3d at 676.  Reliance's refusal to credit Mr. Taylor's evidence of disabling cognitive dysfunction was arbitrary because no evidence contradicted Dr. Uomoto's 2005 report; the medical evidence in Mr. Taylor's file does not support Reliance's contention that Mr. Taylor's symptoms had improved to the point that Mr. Taylor required a re-evaluation by Dr. Uomoto; and, to the extent that Reliance

1   required updated evidence of Mr. Taylor's disability due to cognitive dysfunction, it

2   never informed him of this fact.  Not only did Reliance fail to communicate with Mr.

3   Taylor regarding the effects of his cognitive dysfunction, it failed to explain in its initial

4   termination letter what information he needed to submit to perfect his claim and why this

5   information was necessary.  *Saffon*, 522 F.3d at 870.  This is a direct violation of

6   ERISA's requirement that Reliance engage in a "meaningful dialogue" with Mr. Taylor.

7   *See id.*  Because Reliance did not explain why Mr. Taylor's claim was deficient, Mr.

8   Taylor was unable to submit relevant evidence in support of his appeal.  The fact that

9   Reliance employed two IMEs does not mitigate the effect of these errors.

10          Moreover, Reliance's failure to engage in a meaningful dialogue prevented the full

11   development of the administrative record.  *See Abatie*, 458 F.3d at 973.  The Ninth

12   Circuit has explained that when the administrative record is not fully developed because

13   the plan administrator did not provide a full and fair review of a claim file, as required by

14   ERISA, a court may permit the claimant to present additional evidence.  *Id.*  The purpose

15   of allowing additional evidence is to "recreate what the administrative record would have

16   been had the procedure been correct."  *Id.*  The court concludes that Mr. Taylor should be

17   given the opportunity to submit additional evidence after Reliance engages in a

18   meaningful dialogue with him regarding his claim.

19          For the foregoing reasons, the court finds that Reliance abused its discretion in

20   terminating Mr. Taylor's LTD benefits.

21

22

1

## IV.   CONCLUSION

2          Accordingly, the court DENIES Reliance's motion for summary judgment (Dkt. #

3   35).

4     Dated this 2nd day of September, 2011.

5

6                                                _____

7                                                JAMES L. ROBART
                                                 United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 31