1
2
3
4
5
6
7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8
AT SEATTLE
9
10      ALEX TAYLOR,                                CASE NO. C10-1317JLR

11                          Plaintiff,              ORDER DENYING RELIANCE'S
                                                    MOTION FOR SUMMARY
12                  v.                              JUDGMENT

13      RELIANCE STANDARD LIFE
        INSURANCE COMPANY, et al.,
14
                            Defendants.
15
            This matter comes before the court on Reliance Standard Life Insurance
16
     Company's ("Reliance") motion for summary judgment (Dkt. # 35).  Having considered
17
     the briefing of the parties, the administrative record, and the relevant law, and having
18
     heard oral argument, the court DENIES Reliance's motion for summary judgment (Dkt. #
19
     35).
20
21
22

ORDER- 1

# I.  BACKGROUND

This is an ERISA case in which Plaintiff Alex Taylor challenges Reliance's termination of his long term disability ("LTD") benefits.  Mr. Taylor worked at Defendant Corbis Corporation ("Corbis") from 1998 to 2005.  (Administrative Record ("AR") 623-24.)  After being diagnosed with fibromyalgia in early 2005 (AR 1007), he took a leave of absence under the Family and Medical Leave Act of 1993 (AR 683-86). He returned to work part time, but ultimately he stopped work completely in July 2005. (AR 623-24.)  In August 2005, Mr. Taylor submitted his LTD benefits claim to Reliance, Corbis's LTD insurer.  (*See* AR 628.)  Reliance approved his claim and began paying benefits in October 2005.  (AR 98.)  In November 2006, however, Reliance notified Mr. Taylor that it was terminating his LTD benefits.  (AR 74-76.)  Mr. Taylor timely appealed this decision (AR 168-87), and in September 2007 Reliance affirmed its denial of benefits (AR 13-18).  In August 2010, Mr. Taylor initiated the instant action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover Mr. Taylor's LTD benefits.  (Compl. (Dkt. # 1); *see also* Jan. 7, 2011 Order (Dkt. # 24) (dismissing second, third, and fourth causes of action).)

# II.  ADMINISTRATIVE RECORD

"Judicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d

1  623, 632 (9th Cir. 2009) (en banc).[1] The court, therefore, summarizes the relevant

2  portions of the administrative record below.

3  **A. The Policy**

4       On November 1, 2001, Reliance issued a LTD insurance policy to Corbis ("the

5  Policy"). (AR 595-622.) The Policy covered eligible employees, including Mr. Taylor.

6  (AR 623-24.) The Policy provides that Reliance, in addition to being the insurer, "shall

7  serve as the claims review fiduciary with respect to the [Policy]." (AR 606.) As the

8  claims review fiduciary, Reliance "has the discretionary authority to interpret the . . .

9  [P]olicy and to determine eligibility for benefits." (*Id.*) The Policy further provides that

10  "[d]ecisions by the claims review fiduciary shall be complete, final and binding on all

11  parties." (*Id.*)

12       The Policy states that Reliance "will pay a Month Benefit if an Insured: (1) is

13  Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under

14  the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits

15  satisfactory proof of Total Disability to [Reliance]." (AR 610.) An insured is "Totally

16  Disabled" if:

17        (1) during the Elimination Period and for the first 60 months for which a
            Monthly Benefit is payable, an Insured cannot perform the material
18            duties of his/her regular occupation;

19

20  _____

21     [1] Mr. Taylor submitted a supplemental declaration (Dkt. # 40) that attaches a Social Security disability benefits determination that was decided after Reliance had closed his case. Given that the document is not part of the administrative record, the court will not consider it in
22  ruling on this motion for summary judgment.

(a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; [and]

\* \* \* \* \*

(2) After a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(AR 602.)

## B. Reliance's Initial Determination that Mr. Taylor was Totally Disabled

At the time Mr. Taylor stopped working at Corbis in July 2005, he was a systems engineer. (AR 627.) A systems engineer is required to perform at a sedentary physical exertion level, which involves sitting most of the time; standing or walking for brief periods of time; and lifting, carrying, pushing, or pulling ten pounds occasionally. (AR 689.) Furthermore, a systems engineer frequently types on a computer and uses written and verbal communication, as well as reasoning, math, and language. (AR 625.)

In his August 2005 application for LTD benefits, Mr. Taylor indicated that he was unable to work because of "debilitating pain, fatigue and cognitive dysfunction." (AR 627.) These symptoms first appeared in 2004 (AR 1106), and in January 2005, Dr. Richard Neiman diagnosed Mr. Taylor with fibromyalgia (AR 961, 1007).[2] Between

---

[2] The administrative record does not contain Mr. Taylor's medical records from Dr. Neiman.

January and July 2005, Mr. Taylor was treated by, among others, Dr. Neiman; Dr. Kinne McCabe[3]; and Dr. Philip Milam, Mr. Taylor's primary care physician. During this time, Mr. Taylor worked at Corbis only intermittently as he attempted to treat his fibromyalgia, which affected him with varying degrees of severity. (*See, e.g.*, AR 1007, 1013.) Dr. Milam monitored Mr. Taylor's progress,[4] and in July 2005 he opined that Mr. Taylor was "unable to work in any occupation" at the present time (AR 1109) and recommended that Mr. Taylor "be off work for treatment for the next year" (AR 1108).

After submitting his LTD benefits application to Reliance, Mr. Taylor saw Dr. Jay Uomoto, a specialist in neuropsychology and rehabilitation psychology, for a disability evaluation. (AR 1076-1105.) On September 6, 2005, Dr. Uomoto conducted a one-and-a-half hour clinical interview with Mr. Taylor and performed six hours of cognitive testing. (AR 960.) After reviewing the test results, Dr. Uomoto diagnosed Mr. Taylor with "Cognitive Disorder, NOS," "Fibromyalgia Syndrome (by history)," and "Malaise and Fatigue (by history)." (*Id.*) Although Mr. Taylor performed well on some of the tests Dr. Uomoto administered (*see generally* AR 960-76), Dr. Uomoto found that he

---

[3] Mr. Taylor sought treatment from Dr. McCabe because she is a physician who uses naturopathic remedies. (*See* AR 1007.) Dr. McCabe did not make any formal diagnosis but attempted to treat Mr. Taylor's many physical symptoms. (AR 994-1003.) At one point, she noted that his fatigue and difficulty focusing were related to "self anger" and "perfectionist tendencies." (AR 998.) She never addressed his fibromyalgia diagnosis or made a recommendation regarding whether or not he could work.

[4] Dr. Milam accepted Dr. Neiman's fibromyalgia diagnosis and also diagnosed Mr. Taylor with chronic fatigue. (AR 1005.) This diagnosis was later confirmed by Dr. Lauri Marti in May 2006. (AR 775.)

exhibited cognitive impairment in several areas (AR 977).  Dr. Uomoto summarized his

opinion as follows:

> [Mr. Taylor's] current neuropsychological deficits are likely to significantly impact his ability to carry out his responsibilities in his former position as a systems engineer.  These cognitive problems are likely compounded by problems with persistent pain and fatigue, the latter of which also reduced the patient's attention resources, further influencing his cognitive impairment.  The combination of pain, fatigue, and cognitive performance decrements likely do not allow the patient to maintain continuous and gainful employment in his former position, on a consistent part-time or full-time basis.
>
> Should his fibromyalgia condition change for the better, and there is reduced pain, fatigue, and cognitive impairment, at that point in time, Mr. Taylor could undergo a neuropsychological re-evaluation to document any change in cognition and assist with further vocational planning.

(AR 979.)  Mr. Taylor submitted Dr. Uomoto's report to Reliance on October 6, 2005.

(AR 991.)

On October 18, 2005, Reliance's medical department stated in an internal

document that Mr. Taylor was unable to work: "Restrictions and limitations less than

sedentary are supported [from] date of loss through 1/06."  (AR 990.)  This medical

opinion was based on the records Mr. Taylor submitted, which established that Mr.

Taylor had "fibromyalgia with related cognitive dysfunction."  (*Id.*)  This conclusion was

supported primarily by the records from Dr. Milam (AR 1005-27, 1106-09) and Dr.

Uomoto (AR 1076-1105).

On October 31, 2005, Reliance approved Mr. Taylor's LTD benefits effective

October 7, 2005.  (AR 98.)  The approval letter stated: "Based upon the information

received, we have determined that you meet the group policy's definition of Total

Disability for your occupation." (*Id.*)  The letter further notified Mr. Taylor that "[p]eriodic documentation of your disability status will be required for further benefit consideration.  The physician who is treating you must provide medical documentation of your continuous disability that is satisfactory to us." (*Id.*)

**C. Reliance Requests Additional Evidence of Disability**

On January 23, 2006, Reliance requested Mr. Taylor's "medical records for the period of *September 2005 through the present*." (AR 56 (emphasis in original).)  Mr. Taylor sent updated records on March 9, 2006 (AR 800) and June 6, 2006 (AR 761) from Dr. Steven Overman, Dr. Jon Berner, Dr. Milam, and Dr. Lauri Marti, among others.  Dr. Overman, a rheumatologist, independently diagnosed Mr. Taylor in September 2005 with, among other things, "generalized pain syndrome consistent with fibromyalgia" and "probable bipolar disorder, possibly a major factor in his fibromyalgia, sleep disorder and over-exercising." (AR 804.)  Dr. Overman referred Mr. Taylor to Dr. Berner, a psychiatrist.  (AR 823.)  Dr. Berner saw Mr. Taylor in October and December 2005.  (AR 823, 857.)  He did not diagnosis Mr. Taylor with bipolar disorder, but noted that Mr. Taylor's testosterone levels were low.  (*Id.*)  Dr. Berner's records also show that he supported Mr. Taylor's disability application.  (AR 857.)

Dr. Milam continued to see Mr. Taylor in connection with his fibromyalgia and other complaints, including low testosterone.  During his April 6, 2006 visit, Mr. Taylor reported to Dr. Milam that "[o]verall . . . he has been doing fairly well.  There hasn't been a lot of change thus far in his symptoms." (AR 764.)  Dr. Milam noted that after Mr. Taylor began a new dietary supplement, he "noticed an improvement in his fatigue . . . .

However, in spite of this improvement, he continues to have fatigue, little energy.  He finds that he is quite worn out for a few days after doing anything that is somewhat strenuous."  (*Id.*)  On April 11, 2006, Mr. Taylor reported a pain level of six out of ten.  (*Id.*)  Then on two different visits in July 2006, he reported pain levels of five and four out of ten.  (AR 737, 740.)

On May 26, 2006, Mr. Taylor saw Dr. Marti at the Fibromyalgia & Fatigue Center in Bellevue, Washington.  (AR 776.)  Dr. Marti performed a "tenderpoint evaluation," which is used to diagnose fibromyalgia.  (AR 775.)  To diagnose fibromyalgia, the patient must have a history of widespread pain, as well as pain in 11 of 18 tenderpoint locations on the body.  (AR 211.)  Mr. Taylor exhibited pain in 14 of the 18 tenderpoint locations on his body, and based on this test, Dr. Marti diagnosed him with fibromyalgia.  (AR 775.)  She also noted that he was being treated for low testosterone.  (*Id.*)

**D.  Reliance Seeks Independent Evidence of Disability**

In May 2006, Reliance sought to obtain its own evidence of Mr. Taylor's disability and scheduled Mr. Taylor for a functional capacity evaluation ("FCE").  Mr. Taylor appeared for the FCE with Susan Burnham, a certified legal nurse consultant, who planned to audio tape the examination.  (AR 62.)  The examiner, however, refused to proceed with Ms. Burnham present.  (*Id.*)  Reliance attempted to find another location that would allow an observer to audio tape an FCE (AR 718) but was unsuccessful.  Because Mr. Taylor never participated in an FCE, Reliance sent Mr. Taylor a letter on June 7, 2006 requesting medical records from February 2006 through the present.  (AR 67.)  The letter stated that "[t]he current medical treatment must substantiate less then

sedentary work capacity in order for the LTD (long-term) disability benefits to continue beyond June 2006." (*Id.*)

While waiting for Mr. Taylor's updated medical records, Reliance scheduled Mr. Taylor for an Independent Medical Examination ("IME") with Dr. Aleksandra Zietak, which occurred on September 11, 2006.[5] (*See* AR 702.) Ms. Burnham accompanied Mr. Taylor and audio taped the examination.[6] (*Id.*) Mr. Taylor indicated that the testosterone injections were "not making him feel better." (AR 703.) He reported current symptoms that included lack of energy (*i.e.* only three or four hours of energy a day), pain, "cognitive issues," and migraines. (AR 704.) He stated that in general "he has pain across most of his body, usually in the muscles he has used most recently or in the muscles he [sic] has not used most recently. For example, if he sits on the couch too long, the pain increases." (*Id.*) During the examination, he reported that he had "pain in the back of his legs, in the shoulder area, the muscle in the side of his arms." (*Id.*) He also reported "joint pain in his hands, knees and right big toe." (*Id.*) Dr. Zietak's physical examination resulted in the following report:

> He does not appear to be in acute distress. His attention, concentration, and affect appear to be within normal limits. He appears to follow directions well. . . . Palpation reveals tenderness here and there in the left anterior chest area, upper back, middle back, and right buttock. No trigger points or

---

[5] Dr. Zietak was selected to perform the examination by United Review Services, Inc., a third party with whom Reliance contracted. (*See* AR 702.) She has a specialty in physical medicine and rehabilitation. (AR 713.)

[6] Ms. Burnham prevented Mr. Taylor from providing personal data outside of his home address on the intake paperwork and filling out a "Past History & Review of Systems form or a Pain Diagram." (AR 702.)

muscle spasms are noted. Axial load is negative. Active cervical rotation is 60° to each side, side bending is 30° to each side, flexion is with the chin reaching the chest, and extension is 70°. Active shoulder flexion is 170° bilaterally. Lumbar flexion is 60°, side bending is 40° to each side, and extension is 30°. Rotation is within normal limits. At this point he tells me that his right anterior rib cage is starting to hurt after twisting. Hip range of motion is within normal limits. The arms and legs are within normal limits. The arms and legs are warm and dry and skin color is good. There is no obvious swelling, deformity, or evidence of trophic changes. Muscle tone is within normal limits. Straight leg raise is 90° bilaterally in the reverse position and 45° in the supine, with the claimant reporting left posterior leg pain with left side straight leg raise. Strength is 5/5 in all four extremities. Deep tendon reflexes are 2+ and symmetric throughout. Hoffman and Babinski reflexes are negative. While sitting on the examination table, he tells me he has pain in the right upper arm where I had palpated earlier. He can fully squat while having one hand on the table and one on the chair. He can walk on his heels, walk on his toes, and perform tandem gait. Gait is within normal limits. There is no increase in respiratory rate or pulse at the end of the examination.

(AR 705-06.)

Dr. Zietak also reviewed Mr. Taylor's medical records that Reliance had forwarded to her. (AR 706-10.) Her report briefly summarized Dr. Milam's records from December 2004 through January 2006; Dr. McCabe's records from January through March 2005; Dr. Uomoto's September 2005 report; Dr. Overman's records from September and October 2005; and Dr. Berner's records from October and December 2005. (*Id.*)

Based on her physical examination and review of Mr. Taylor's medical records, Dr. Zietak diagnosed him with "[s]ubjective complaints of pain, fatigue, and mental slowness" and "[d]isability conviction," among other things. (AR 710.) In response to Reliance's directive that she describe her examination and findings in detail, she wrote, "My examination and findings are described above . . . . I find the claimant's

concentration, attention, ability to follow directions, and affect to be within normal limits.
He provides a good history.  I find no trigger points or clinical abnormalities of the
muscles or joints."  (AR 710-11.)  In response to Reliance's request that she explain Mr.
Taylor's specific diagnoses and prognoses within Dr. Zietak's field of specialty, she
wrote:

> Specific diagnoses are as listed above.  Review of the medical records
> provided reveals no objective findings consistent with any diagnosis to
> explain the claimant's subjective complaints of pain, fatigue, and mental
> slowness.  On Jan. 4, 2005 Kinne McCabe notes that the claimant said he
> had "every kind of test and specialist eval with no diagnosis." . . . The
> prognosis is uncertain because of the claimant's disability conviction.
> Secondary gain cannot be ruled out.

(*Id.*)  In response to a question regarding whether treatment is appropriate, Dr. Zietak
responded, "I find no evidence that the claimant has fibromyalgia.  A psychiatrist could
determine whether treatment is appropriate for the claimant's disability conviction."  (*Id.*)

On November 3, 2006, Dr. Zietak completed a "Physical Capacities
Questionnaire" in which she indicated that Mr. Taylor had no physical limitations and
could work at a "medium lift" exertion level, which meant that he could exert "20-50
pounds of force occasionally, and/or 10-25 pounds of force frequently, and/or a
negligible up to 10 pounds amount of force constantly."  (AR 712.)  She also noted that
Mr. Taylor had a "strong disability conviction."  (AR 713 (emphasis in original).)

**E.  Mr. Taylor Provides Updated Medical Records**

In response to Reliance's June 7, 2006 letter, Mr. Taylor submitted updated
records from Dr. Milam and Dr. Marti, among others, on September 25, 2006.  On

August 2, 2006, Mr. Taylor had seen Dr. Milam regarding the testosterone injections he

was receiving. (AR 742.) Dr. Milam wrote of Mr. Taylor:

> He says he felt much improved on the higher level of testosterone. He had
> more energy and actually worked in his yard up to 6 hours in a day, which
> has been very rare. He was a bit sore after that but believes the trade off is
> definitely worth it. . . . Overall he is quite happy with the results. He is
> interested in continuing with the testosterone.

(*Id.*) Mr. Taylor's reported pain level during that visit was three out of ten. (AR 744.) A

nurse's note from August 30, 2006 indicated that Mr. Taylor reported a pain level of six

out of ten on that day. (AR 749.)

**F. Reliance Terminates Mr. Taylor's LTD Benefits**

On November 21, 2006, Reliance sent Mr. Taylor a letter notifying him that it was

terminating his LTD benefits. (AR 74-76.) Reliance outlined the requirements for

receiving LTD benefits and stated that Mr. Taylor needed to establish that he could not

perform a sedentary level occupation. (*See* AR 75.) The letter explained, "In order to

evaluate whether [Mr. Taylor] is capable of performing the material duties of his own

[sedentary level] occupation, we have requested and reviewed the results of an

Independent Medical Evaluation (IME) . . . along with the information previously

contained in the file." (*Id.*) With respect to Dr. Zietak's report, the letter noted that

"[t]he physical examination did not reveal any objective findings consistent with any

diagnosis to explain [Mr. Taylor's] subjective complaints. . . . It is also noted that there's

no evidence of Fibromyalgia and a psychiatrist could determine if a psychiatric diagnosis

supports impairment." (*Id.*) The letter concluded that "the medical information in [sic]

file does not support an impairment, which would interfere with [Mr. Taylor's] ability to

perform the material duties of a sedentary duty occupation as a Systems Engineer, as well

as performing any occupation for which his education, training or experience would

reasonably allow." (*Id.*) The letter also explained Mr. Taylor's right to appeal and how

to do this. (AR 76.)

**G. Mr. Taylor Appeals Reliance's Termination of his LTD Benefits**

On May 25, 2007, Mr. Taylor submitted to Reliance his appeal letter (AR 168-87),

along with letters from Dr. Overman (AR 544-53), Dr. Uomoto (AR 555-78), Ms.

Burnham (AR 213), and extensive medical literature about fibromyalgia (AR 214-542).

Dr. Overman's letter stated that he had six appointments with Mr. Taylor, the most recent

of which was on February 13, 2007. (AR 544.) During the February 13 appointment,

Mr. Taylor "continued to complain of severe problems with thinking, memory and sleep

as well as overall pain and reduced function." (*Id.*) He further noted that Mr. Taylor

"had diffuse tenderness that was mild." (*Id.*) Based on his knowledge of Mr. Taylor's

overall treatment for fibromyalgia, he opined that Mr. Taylor "is prevented from

performing the material duties of his own or any occupation due to the symptoms of pain,

fatigue, and cognitive problems well documented in his records." (AR 546.)

Dr. Overman also criticized the IME report from Dr. Zietak. (AR 545-46.) Dr.

Overman noted that Dr. Zietak concluded that there were no "objective findings" to

support Mr. Taylor's complaints, but "her evaluation of concentration and attention did

not include any specific objective measures."[7]  (AR 545.)  Dr. Overman further attacked

her conclusion that there was no evidence supporting Mr. Taylor's fibromyalgia

diagnosis because she did "not delineate the specific 18 classification points" for a

fibromyalgia diagnosis.  (AR 545-46.)  He also noted that there was "no detailed

assessment on her part that would substantiate a 'disability conviction,'" and that her

conclusion that Mr. Taylor needed psychiatric consultation did not take into account that

Mr. Taylor had already received such treatment from Dr. Berner.  (AR 546.)  In her

report, Dr. Zietak had incorrectly described Dr. Berner as a psychologist, rather than a

psychiatrist.  (AR 545.)

　　　　Dr. Uomoto's letter similarly criticized Dr. Zietak's report and her methodologies

and qualifications for assessing Mr. Taylor's cognitive abilities.  (AR 555-56.)  Dr.

Uomoto had not assessed Mr. Taylor since 2005, but he opined that "it is very unlikely

that cognitive symptoms would have improved enough to enable Mr. Taylor to be able to

work competitively in any occupation, unless his underlying medical conditions were

significantly improved."  (*Id.*)

　　　　Finally, Ms. Burnham's letter explained inconsistencies between the examination

she observed and Dr. Zietak's report.  (AR 213.)  Ms. Burnham stated that Dr. Zietak did

not in fact perform a complete tenderpoint evaluation, and she did not take Mr. Taylor's

---

[7] Dr. Overman also pointed out that Dr. Zietak stated that Mr. Taylor was a smoker when
he does not in fact smoke.  (AR 545.)  Dr. Zietak's incorrect statement, however, appears to be
the result of a typo.  Dr. Zietak wrote, "He does smoke cigarettes.  He did try cigarettes in the
past."  (AR 705.)  If Dr. Zietak actually understood Mr. Taylor to smoke cigarettes, it is unlikely
that she would have written that he tried them in the past.

pulse at the end of the examination even though her report stated that he had "no increase in respiratory rate or pulse at the end of the examination." (*Id.*)

**H. Reliance Affirms its Termination of Mr. Taylor's LTD Benefits**

On September 12, 2007, Reliance denied Mr. Taylor's appeal. (AR 13-18.) In its denial letter, Reliance addressed Mr. Taylor's contention that Dr. Zietak "is unqualified to render expert opinions about fibromyalgia . . . [as] [h]er specialty does not include any aspect of rheumatology, psychology or psychiatry, and she is not qualified to render opinions about anyone's precise cognitive state." (AR 15.) Reliance affirmed its position that Dr. Zietak was qualified but noted that it sent Mr. Taylor's entire file, including the documents submitted in support of his appeal, for review by an IME rheumatologist, Dr. Anne MacGuire. (AR 14, 693-96.) Dr. MacGuire reviewed the file and concluded that "[n]o restrictions and limitations are supported by any medical evidence throughout this medical evaluation. . . . None of [Mr. Taylor's physicians] have documented limited range of motion, synovitis, weakness or any evidence of clinical functional abnormality. No laboratory findings have objectified his numerous subjective complaints." (AR 15-16, 695.) Reliance observed further that "in Dr. MacGuire's opinion, there appears to be no neurological basis for the 'cognitive problems' that you cite." (AR 16.) Reliance concluded that "Dr. MacGuire's report conclusively verifies a lack of work impairment that would preclude Mr. Taylor from performing his own occupation." (AR 17.) Accordingly, Mr. Taylor was not Totally Disabled, as defined by the Policy. (*Id.*) Reliance advised Mr. Taylor that its claim decision was final and that he had a right to bring a civil claim under ERISA. (AR 17-18.)

1    Nevertheless, on October 10, 2007, Mr. Taylor requested an additional appeal,

2  citing alleged concerns regarding the completeness of the materials Dr. MacGuire

3  reviewed.  (AR 5-7.)  On October 11, 2007, Reliance confirmed that Dr. MacGuire had

4  received all records in the claim file and denied Mr. Taylor's request for a second appeal,

5  citing its policy of providing only one appeal.  (AR 3.)

6                          **III.    ANALYSIS**

7  **A. Standard of Review**

8          Ordinarily, summary judgment is appropriate if there is no genuine issue as to any

9  material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

10  P. 56(a).  In ERISA actions, however, where the plaintiff is challenging the plan

11  administrator's denial of benefits and the abuse of discretion standard applies, *see infra* §

12  III(A)(2), "a motion for summary judgment is merely the conduit to bring the legal

13  question before the district court and the usual tests of summary judgment, such as

14  whether a genuine dispute of material fact exists, do not apply," *Bendixen v. Standard*

15  *Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) (overruled in part on other grounds by *Abatie*

16  *v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966-69 (9th Cir. 2006) (en banc)); *see also*

17  *Nolan v. Heald Coll.,* 551 F.3d 1148, 1154 (9th Cir. 2009).  Thus, a summary judgment

18  motion resting on the administrative record is not a typical summary judgment, but

19  rather, is a procedural vehicle for determining whether benefits were properly granted or

20  denied.

21

22

### 1. Whether De Novo Review Applies

In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011), the Ninth Circuit synthesized and clarified the appropriate standard of review for the denial of ERISA benefits. Courts apply de novo review unless the plan "expressly and unambiguously gives the administrator discretion to determine eligibility." *Id.* at 673. Where the plan gives the administrator discretion, courts review for an abuse of the plan administrator's discretion. *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Here, the Policy stated: "[Reliance] has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." (AR 606.) This grant of discretion is unambiguous, therefore the court reviews for an abuse of discretion.

Although Mr. Taylor concedes that the policy language unambiguously grants Reliance discretion, he nevertheless asserts that de novo review is appropriate. (Resp. at 12-13.) Mr. Taylor argues that there is no evidence that Corbis granted Reliance discretionary authority because the record does not contain a copy of the ERISA plan for Corbis, only a copy of the Policy. (Resp. at 13.) Mr. Taylor, however, cites no authority for his assertion that the record must contain a copy of the ERISA plan. The Policy, as a contract between Corbis and Reliance, is sufficient to grant Reliance discretionary authority. Mr. Taylor further contends that the Policy "is not the policy that would govern a disability commencing in 2005, since on its face it states its effective date is November 1, 2001 . . . ." (*Id.*) The fact that the Policy went into effect in 2001does not preclude it from remaining in effect in 2005. Mr. Taylor cites no evidence that some

superseding policy governs Mr. Taylor's claim. Because the Policy expressly and unambiguously grants Reliance discretion to determine benefits eligibility, the court reviews for abuse of discretion.

### 2. Abuse of Discretion Standard

The central question in an ERISA case where the abuse of discretion standard applies is whether the plan administrator's decision to deny benefits was reasonable. *Salomaa*, 642 F.3d at 675. Reasonableness does not mean that the court would make the same decision. *Id.* At the same time, "deference to the plan administrator's judgment does not mean that the plan prevails." *Id.* "[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether 'we are left with a definite and firm conviction that a mistake has been committed.'" *Salomaa*, 642 F.3d at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (citation and quotation omitted)). To apply the abuse of discretion test, the court must consider "whether application of a correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* at 676 (quoting *Hinkson*, 585 F.3d at 1262).

Where the insurer is both the funding source and plan administrator, as is the case here, the administrator operates under a structural conflict of interest, *Abatie*, 458 F.3d at 965, which requires "a more complex application of the abuse of discretion standard," *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 626 (9th Cir. 2009). The court must weigh the conflict of interest as a factor in determining whether the administrator abused its discretion, however the weight given to the factor varies depending on the

specific facts of each case. *Salomaa*, 642 F.3d at 674 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)); *see also Abatie*, 458 F.3d at 968.

Reliance argues that it actively alleviated the structural conflict of interest by relying on two IME reports to assess Mr. Taylor's disability. (Mot. at 10-11 (citing *Montour*, 588 F.3d at 630).) *Montour*, however, does not support Reliance's argument. Whether an administrator employs an IME is one among many factors that courts consider in determining whether an administrator abused its discretion, but it does not change the weight that the court assigns to the conflict of interest. *Montour*, 588 F.3d at 630. Given the absence of any evidence that would accord Reliance's structural conflict of interest greater or lesser weight, the court concludes that the conflict warrants moderate weight.

**B. Reasonableness of Reliance's Termination of Mr. Taylor's Benefits**

Reliance argues that its termination of Mr. Taylor's benefits was reasonable because Mr. Taylor's physicians identified the cause of his physical problems—low testosterone—and the treatment was so successful that Mr. Taylor worked in his yard for up to six hours one day. (Mot. at 11.) Reliance points out that it based its decision on two IME reports, which found that there was no evidence that Mr. Taylor had a physical impairment. (Mot. at 12.) Furthermore, Reliance argues that it was under no obligation to defer to Mr. Taylor's treating physicians, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), who, in any event, failed to provide objective evidence that Mr. Taylor's diagnosis was disabling, *see Jordan v. Northrop Grumman Corp. Welfare*

*Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004) (overruled in part on other grounds by *Abatie*, 458 F.3d at 969). (Mot. at 12-13.)

Mr. Taylor disputes the reasonableness of Reliance's determination for four primary reasons: (1) Reliance did not provide a full and fair review of his file and therefore violated ERISA; (2) Reliance improperly required objective proof of disability while ignoring objective evidence of Mr. Taylor's disabling cognitive dysfunction and dismissing his subjective complaints of pain and fatigue; (3) Reliance unreasonably ignored Mr. Taylor's complaints of chronic pain and fatigue from fibromyalgia; and (4) Reliance's decision to terminate his benefits was illogical because Reliance had no reliable evidence that his medical condition had changed. (*See generally* Resp.) The court addresses each contention in turn and then weighs the relevant factors, including the structural conflict of interest. The court concludes that Reliance abused its discretion.

### 1. Full and Fair Review of Mr. Taylor's File

When assessing a claimant's appeal of a termination of benefits, an administrator must provide a "full and fair review" of the file. 29 C.F.R. § 2560.503-1(h)(2). Mr. Taylor asserts a two-pronged argument as to why Reliance's review of his file violated ERISA: (a) Reliance did not take into account all of the comments in his claim file; and (b) Reliance did not engage in the necessary "meaningful dialogue." (Resp. at 17-20.) The court concludes that Reliance did not provide a full and fair review of Mr. Taylor's file as required by ERISA.

### a. Consideration of All Comments in Claim File

A plan administrator must provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.  29 C.F.R. § 2560.503-1(h)(2).  A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," but is not required to automatically "accord special weight to the opinions of a claimant's physician."  *Nord*, 538 U.S. at 834.  Furthermore, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Id.*

Mr. Taylor asserts that Reliance did not explain why it did not give meaningful weight to the information in the record that favors Mr. Taylor, that is, Dr. Uomoto's reports, Dr. Overman's 2007 report, the medical literature Mr. Taylor submitted in support of his appeal, and all of the other medical records in his file.  (Resp. at 17.)  Mr. Taylor draws particular attention to Dr. Uomoto's 2005 report, which included objective findings of a disability based on cognitive dysfunction.  (Resp. at 18.)  Mr. Taylor further asserts that there was no change in his medical condition that would justify Reliance's abandonment of this evidence.  (*Id.*)

Reliance responds that it did not ignore the evidence, rather it rejected it.  (Reply at 8 (citing *Jordan*, 730 F.3d at 877).)  In *Jordan*, the court concluded that the administrator did not "ignore" the claimant's physicians' reports, but rather "considered and *rejected* them, after careful consideration."  *Jordan*, 370 F.3d at 877 (emphasis in

original).  *Jordan*, however, is distinguishable from this case.  The administrator in

*Jordan* repeatedly asked the claimant's treating physicians to explain *why* the claimant's

diagnosis of fibromyalgia caused her to be disabled, but her doctors failed to respond.  *Id.*

Three IMEs with different specialties reviewed the claimant's file, and each of them

disagreed with her treating physicians' finding of disability.  *Id.*  The administrator also

sent the peer review reports to the treating physicians and asked for an explanation of

why they disagreed.  *Id.* at 878.  Again, the treating physicians failed to respond.  *Id.*

Here, by contrast, the record does not establish that Reliance's consideration of Mr.

Taylor's file was as "careful" as that of the administrator in *Jordan*.  Reliance never

corresponded with Mr. Taylor's treating physicians to seek additional information as to

why his fibromyalgia was disabling, and it never sought out his treating physicians'

objections to Dr. Zietak's report.  *Jordan*, therefore, does not support Reliance's position.

     Furthermore, Reliance had no grounds upon which to reject Dr. Uomoto's 2005

report.  Although *Nord* establishes that that a plan administrator does not need to provide

an explanation when it credits reliable evidence that conflicts with a treating physician's

evaluation, *Nord* does not excuse an administrator from explaining why it has refused to

credit reliable evidence that is not contradicted by other evidence in the record.  *See*

*Nord*, 538 U.S. at 834 (noting that plan administrators "may not arbitrarily refuse to

credit a claimant's reliable evidence").  In this case, there is no reliable evidence in the

record that contradicts Dr. Uomoto's 2005 diagnosis of a disabling cognitive disorder, but

in its two denial letters, Reliance failed to explain why it did not rely on Dr. Uomoto's report.[8]

Reliance argues that it did not need to rebut Dr. Uomoto's opinion because (1) Dr. Uomoto's report does not support Mr. Taylor's cognitive complaints; and (2) Mr. Taylor was never reassessed by Dr. Uomoto after Mr. Taylor's condition improved due to the testosterone shots. Each argument is unpersuasive. First, Reliance relied on Dr. Uomoto's report when it made its initial determination that Mr. Taylor was disabled. (AR 990 (noting in an internal Reliance document that Mr. Taylor had "fibromyalgia with related cognitive dysfunction").) To now attempt to discredit the report is disingenuous and raises concerns that Reliance's structural conflict of interest has impacted its assessment of Mr. Taylor's claim.

Second, although there is some evidence in the record that Mr. Taylor's symptoms improved with the testosterone shots (AR 742-43), the balance of the record does not suggest the overall improvement that Reliance claims. On August 2, 2006, Mr. Taylor reported some improvement and a pain level of three out of ten (*id.*), but on August 30, 2006, he reported a pain level of six out of ten (AR 749). On September 11, 2006, Mr. Taylor reported that the testosterone injections had not been helping. (AR 703.) Furthermore, Dr. Overman stated in his 2007 letter that Mr. Taylor continued to

_____

[8] Dr. Zietak and Dr. MacGuire were both unqualified to offer an opinion regarding Mr. Taylor's neuropsychological functioning. As Dr. Uomoto explained in his 2007 letter to Reliance, extensive training is required to perform neuropsychological assessments, and Dr. Zietak, based on her credentials, was unqualified to render an opinion in this area. (AR 556.) Furthermore, Reliance admitted that Dr. MacGuire did not assess Mr. Taylor's neuropsychological condition. (Reply at 6.)

experience "severe problems with thinking, memory and sleep as well as overall pain and reduced function." (AR 544.) These facts contradict Reliance's claim that in November 2006, "the cause of [Mr. Taylor's] problems was identified and treated" (Mot. at 11). Because it was unreasonable for Reliance to conclude, based on the entire claim file, that Mr. Taylor's symptoms had improved, it was unreasonable for Reliance to abandon its initial reliance on Dr. Uomoto's 2005 report without informing Mr. Taylor of this change. The court, therefore, concludes that Reliance arbitrarily refused to credit Mr. Taylor's objective evidence that he had disabling cognitive dysfunction, which prevented a full and fair review of Mr. Taylor's claim file.

### b. Meaningful Dialogue

Mr. Taylor also argues that Reliance did not engage in a "meaningful dialogue" with him, as required by ERISA, because Reliance did not inform him of what information he needed to submit to perfect his claim. (Resp. at 19-20.) As an ERISA program administrator, Reliance must engage in a "meaningful dialogue" with a claimant. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870 (9th Cir. 2008). This means that when an administrator terminates a claimant's long term disability benefits, it must provide the claimant with a written notice of the denial of benefits that includes a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary. 29 C.F.R. § 2560.503-1(g). Furthermore, the administrator must describe the necessary additional material "in a manner calculated to be understood by the claimant." *Saffon*, 522 F.3d at 870 (quoting 29 C.F.R. § 2560.503-1(g)).

1    Mr. Taylor contends that Reliance did not adequately describe the additional

2    material necessary for him to perfect his claim in its initial denial letter.  (Resp. at 20.)

3    Reliance argues that it fulfilled this requirement when it explained in the initial denial

4    letter that there was "an absence of medical evidence to confirm any significant

5    impairment that would keep [Mr. Taylor] from doing any of the material duties of his

6    job."  (Reply at 8 (quoting AR 75).)  In *Saffon*, the court considered the sufficiency of an

7    administrator's termination letter, which stated that "[t]he medical information provided

8    no longer provides evidence of disability that would prevent [the claimant] from

9    performing [her] job or occupation."  *Saffon*, 522 F.3d at 870.  The court concluded that

10   this statement was "uninformative" because it did not explain why this was the case or

11   address the claimant's evidence to the contrary.  *Id.*  Reliance's explanation here is

12   similarly vague.  It did not sufficiently describe what information Mr. Taylor needed to

13   submit to perfect his claim, and it did not explain why this information was necessary.[9]

14   Furthermore, Reliance did not address Dr. Uomoto's 2005 report, which provided

15   evidence that Mr. Taylor's cognitive disorder prevented him from performing his

16   occupation.  Reliance, therefore, failed to comply with ERISA's requirement that it

17   engage in a meaningful dialogue with Mr. Taylor.  *See id.*

18

19

20   _____

21   [9] Although Mr. Taylor bears the burden of establishing a continuing disability under the
     plan (Mot. at 13), it is unreasonable for Reliance to criticize him for failing in his burden when
22   Reliance did not comply with its ERISA obligation to explain what documents Mr. Taylor
     should have submitted and why these were necessary.

### 2. Reliance's Requirement of Objective Evidence

Mr. Taylor next argues that Reliance acted contrary to Ninth Circuit precedent in requiring him to provide objective evidence of his impairment instead of crediting his subjective complaints of pain and fatigue and Dr. Uomoto's objective findings regarding his cognitive disorder. (Resp. at 20-21.) In *Salomaa*, the court adopted dicta from *Jordan* and held that "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious." *Salomaa*, 642 F.3d at 678. In *Jordan*, a case involving the termination of LTD benefits where the claimant had fibromyalgia, the court distinguished between objective evidence of a diagnosis and objective evidence that a condition was disabling. *Jordan*, 370 F.3d at 877. Although it was impermissible for the administrator to require objective evidence of a diagnosis, such a fibromyalgia, that cannot be established through laboratory tests or x-rays, the court found that the administrator was permitted to require objective findings that the claimant's condition prevented her from performing her occupation. *Id.* Therefore, Reliance did not abuse its discretion in requiring Mr. Taylor to submit evidence that his subjective complaints were severe enough to prevent him from performing his occupation. Reliance, however, arbitrarily refused to credit Dr. Uomoto's 2005 report, which provided objective evidence that Mr. Taylor's cognitive dysfunction prevented him from performing his occupation. (*See supra* § III(B)(1)(a).)

### 3. Mr. Taylor's Complaints of Chronic Pain and Fatigue

Mr. Taylor next relies on *Pappas v. Reliance Standard Life Insurance Company*, 20 F. Supp. 2d 923 (E.D. Va. 1998), to argue that Reliance wrongly ignored Mr. Taylor's

complaints of chronic pain and fatigue from fibromyalgia. (Resp. at 21-22.) In *Pappas*, the claimant was diagnosed with atypical Post Traumatic Migraine Disorder after slipping and striking her head against a car door. *Pappas*, 20 F. Supp. 2d at 925-26. She suffered severe headaches; a sensation of pressure in her head; nausea; intolerance to motion, light, and noise; bleeding from the ear canal; and lightheadedness accompanied by impaired concentration and vision. *Id.* at 925. Reliance denied her claim for LTD benefits based on a lack of objective medical documentation to support her subjective complaints. *Id.* at 927. The district court concluded that Reliance abused its discretion, in part, because it "conceded and did not dispute the existence, severity, frequency or duration of plaintiff's persistent symptoms . . . [but did not] squarely address whether these undisputed severe and persistent symptoms were compatible or incompatible with plaintiff's ability to perform the essential duties of her job as a CPA." *Id.* at 930.

In contrast to *Pappas*, here, Reliance did not demand objective proof of Mr. Taylor's subjective complaints. Rather, it requested medical evidence establishing that he could not perform a sedentary level job. This is permissible in the Ninth Circuit. *See Jordan*, 370 F.3d at 877. Moreover, Reliance did not "concede" the existence of Mr. Taylor's symptoms; Dr. Zietak performed an in-person examination of Mr. Taylor and concluded that he did not have fibromyalgia despite his subjective complaints of pain.[10]

---

[10] Although Mr. Taylor asserts that Dr. Zietak's report was deficient and biased (*see generally* Resp.), the court concludes that Reliance did not abuse its discretion in relying on it. First, Dr. Zietak is an independent medical examiner, and at least one court has found that she is qualified to assess and diagnose fibromyalgia. *See Carder-Cowin v. Unum Life Ins. Co. of Am.*, 560 F. Supp. 2d 1006, 1112-13 (W.D. Wash. 2008) (favorably assessing Dr. Zietak's

(*See* AR 710-11.)  In sum, the court concludes that Reliance acted within its discretionary authority when it requested medical evidence that Mr. Taylor's symptoms prevented him from performing his occupation.  As previously discussed, however, Reliance did not properly inform Mr. Taylor of the reasons why his claim was deficient so that he could submit additional evidence that addressed Reliance's concerns.  (*See supra* § III(B)(1).)

### 4.  Evidence of a Change in Mr. Taylor's Medical Condition

Finally, Mr. Taylor argues that Reliance improperly terminated his benefits without evidence that his medical condition had changed.  (Resp. at 22.)  The Ninth Circuit's opinion in *Muniz v. Amec Construction Management, Inc.*, 623 F.3d 1290 (9th Cir. 2010), suggests otherwise.  In *Muniz*, the district court, under a de novo standard of review, held that the claimant failed to meet his burden of establishing that he was disabled under the terms of his LTD policy.  *Id.* at 1293-94.  On appeal, the claimant argued that the district court clearly erred because his medical records did not show a change in his condition.  *Id.* at 1296.  The Ninth Circuit rejected this argument:

> [T]he fact that the claimant was initially found disabled under the terms of the plan may be considered evidence of the claimant's disability, but as the Eighth Circuit stated in *McOsker v. Paul Revere Life Insurance Co.*, "[w]e are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind."

independence and qualifications to diagnose fibromyalgia).  Second, Dr. Zietak's report contained some evidence from which Reliance could infer that she performed a tenderpoint evaluation.  Her report stated, "Palpitation reveals tenderness here and there in the left anterior chest area, upper back, middle back, and right buttock."  (AR 705.)  Although Dr. Overman and Ms. Burnham claimed that this was not a proper tenderpoint evaluation, it is enough for Reliance to infer that Dr. Zietak reasonably concluded that Mr. Taylor did not have fibromyalgia.  *See Salomaa*, 642 F.3d at 676 (setting forth the test for an abuse of discretion, which includes consideration of whether the administrator's application of the correct legal standard was supported by "inferences that may be drawn from the facts in the record").

*Muniz*, 623 F.3d at 1296-97 (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)).  *Muniz*, therefore, stands for the proposition that a plan administrator may, under the appropriate circumstances, terminate LTD benefits where the claimant's underlying condition has not changed.  Mr. Taylor, therefore, is not entitled to everlasting benefits unless and until his condition changes.  Rather, Reliance may require Mr. Taylor to provide ongoing evidence that his condition prevents him from working in his occupation.  *See id.* (affirming the district court's finding that the claimant was capable of performing a sedentary occupation even though there was no evidence that his underlying condition had changed).

### 5.  Weighing the Relevant Factors

The court must weigh the relevant factors to determine whether Reliance abused its discretion.  *See Abatie*, 458 F.3d at 968.  Reliance's structural conflict of interest and failure to provide a full and fair review of Mr. Taylor's claim weigh against it, *see id.*; *Salomaa*, 642 F.3d at 679, but the fact that it employed two IMEs weighs in its favor, *see Montour*, 588 F.3d at 630.  After carefully considering the administrative record and these factors, the court is "left with a definite and firm conviction that a mistake has been committed."  *Salomaa*, 642 F.3d at 676.  Reliance's refusal to credit Mr. Taylor's evidence of disabling cognitive dysfunction was arbitrary because no evidence contradicted Dr. Uomoto's 2005 report; the medical evidence in Mr. Taylor's file does not support Reliance's contention that Mr. Taylor's symptoms had improved to the point that Mr. Taylor required a re-evaluation by Dr. Uomoto; and, to the extent that Reliance

required updated evidence of Mr. Taylor's disability due to cognitive dysfunction, it never informed him of this fact. Not only did Reliance fail to communicate with Mr. Taylor regarding the effects of his cognitive dysfunction, it failed to explain in its initial termination letter what information he needed to submit to perfect his claim and why this information was necessary. *Saffon*, 522 F.3d at 870. This is a direct violation of ERISA's requirement that Reliance engage in a "meaningful dialogue" with Mr. Taylor. *See id.* Because Reliance did not explain why Mr. Taylor's claim was deficient, Mr. Taylor was unable to submit relevant evidence in support of his appeal. The fact that Reliance employed two IMEs does not mitigate the effect of these errors.

Moreover, Reliance's failure to engage in a meaningful dialogue prevented the full development of the administrative record. *See Abatie*, 458 F.3d at 973. The Ninth Circuit has explained that when the administrative record is not fully developed because the plan administrator did not provide a full and fair review of a claim file, as required by ERISA, a court may permit the claimant to present additional evidence. *Id.* The purpose of allowing additional evidence is to "recreate what the administrative record would have been had the procedure been correct." *Id.* The court concludes that Mr. Taylor should be given the opportunity to submit additional evidence after Reliance engages in a meaningful dialogue with him regarding his claim.

For the foregoing reasons, the court finds that Reliance abused its discretion in terminating Mr. Taylor's LTD benefits.

# IV. CONCLUSION

Accordingly, the court DENIES Reliance's motion for summary judgment (Dkt. # 35).

Dated this 2nd day of September, 2011.

_____
JAMES L. ROBART
United States District Judge